**LOCAL UNION NO. 1056, UNITED BROTHERHOOD OF CARPENTERS AND JOINERS OF AMERICA; Thomas Elder, in his capacity as President and as a member of Local Union 1056; and Raymond Buelow, in his capacity as Recording Secretary and as a member of Local Union 1056, Plaintiffs,**

v.

**THE GREATER FOX RIVER VALLEY DISTRICT COUNCIL and Ronald Kopp, individually and in his capacity as Business Manager of the Greater Fox River Valley District Council, Defendants.**

Civ. A. No. 90–C–0506.

United States District Court,
E.D. Wisconsin.

April 6, 1993.

John S. Williamson, Jr., Appleton, WI, for plaintiffs.

Matthew R. Robbins, Previant Goldberg Uelmen, Milwaukee, WI, for defendants.

## DECISION AND ORDER

REYNOLDS, Senior District Judge.

In this action, plaintiff Local Union No. 1056, ("Local 1056") claims that its parent organization, defendant The Greater Fox River Valley District Council ("the Council"), denied Local 1056 members their right to an equal vote, in violation of the Labor-Management Reporting and Disclosure Act ("LMRDA"), 29 U.S.C. § 411(a)(1), denied certain Local 1056 members their procedural rights respecting discipline, also in violation of the LMRDA, 29 U.S.C. § 411(a)(5),

breached the duty of fair representation, and improperly adopted certain collective-bargaining agreements.

On March 4, 1992, the Council and its business manager, defendant Ronald Kopp ("Kopp"), filed a motion for summary judgment. On March 20, Local 1056 and two of its officers, plaintiffs Thomas Edler and Raymond Buelow, filed a cross-motion for partial summary judgment. For reasons stated below, defendants' motion is granted in part and denied in part, and plaintiffs' motion is granted in part and denied in part.

Jurisdiction in this court is based upon 28 U.S.C. §§ 1331 and 1334, and 29 U.S.C. §§ 185 and 412.

### FACTS [1]

The Council is an umbrella group representing carpenters, millwrights and similar workers employed in the upper Wisconsin construction industry. In 1990, the Council entered into a collective bargaining agreement with a group of construction contractors belonging to the Wisconsin Chapter of the Associated General Contractors of America, Inc. ("AGC"). The agreement, which lasts until June 1993, is binding upon eight local unions associated with the United Brotherhood of Carpenters and Joiners of America ("United Brotherhood"), including Local 1056.

Local 1056 is different from the other local unions in that its members are exclusively millwrights, who build and repair machinery, as opposed to carpenters, who do the same to buildings. Membership in the other local unions is based upon area of residence, rather than job classification. Just over half of the millwrights bound by the Council's agreement belong to Local 1056. The agreement places millwrights in a higher wage class than carpenters and other workers, but otherwise contains no separate provisions for millwrights. In this respect, the Council's agreement differs from area-wide agreements in Minnesota, upper Michigan, and lower Wisconsin, where millwrights are covered by separate agreements or addenda.

In 1989, the Council's Executive Committee began considering amendments to its by-laws. Each local union was represented on the committee; Local 1056 was represented by Rick Barber. One of the proposed amendments would have changed Section 37 of the by-laws to read,

> The [Council's] Business Manager shall attend meetings of the affiliated Locals as often as possible, and shall *represent* affiliated Local Unions in negotiations, grievances, and any other matters as his services may be needed and requested.

(Compl., Ex. C., at 2 (emphasis added).) Previously, Section 37 read,

> The [Council's] Business Manager shall attend meetings of the affiliated Locals as often as possible and shall *assist* affiliated Local Unions on negotiations, grievances, and other matters as his services may be needed and requested.

(Compl., Ex. B., at 15 (emphasis added).) Thus, the amendment would expand the role of the Council from that of an aide to that of a representative and would reduce the role of the local unions from that of independent negotiators to that of constituents.

As a matter of practice, however, the amendment would change relatively little. The Council had always acted as a bargaining representative for the local unions; they did not negotiate independently. This practice, according to defendants, was based on a long-standing interpretation of Section 3 of the Council's by-laws, which provided that the "Council shall be the central governing body and shall have legislative and executive powers on all matters relating to the general interest and welfare of" the local unions. (Compl., Ex. B., at 3.)

In October 1989, Kopp, the Council's business manager, sent to each member of the Executive Committee, including the representative of Local 1056, a copy of the proposed amendment to Section 37 and other proposed amendments. In November 1989, the proposed amendments were read to delegates of the local unions, including Local

---

1. The following is based upon the parties' statements of fact and supporting materials. Neither side has responded to the other's factual statements. Thus, factual assertions made by one side and not contradicted by the other are deemed to be undisputed. Local Rule 6.05(d).

1056, which unanimously approved the amendments and decided to submit them to a membership vote, scheduled for January 1990. In December 1989, several members of Local 1056 asked Kopp to provide them with copies of the proposed amendments, so that the amendments could be discussed prior to the January vote. Kopp denied the request. No other local union made such a request, and no local union's general membership received copies of the proposed amendments.

On December 22, 1989, Local 1056 sent to the other local unions a letter urging them to reject the proposed amendment to Section 37. The letter quoted the amendment verbatim and described it as a serious threat to the autonomy of local unions. (Compl., Ex. C.). In early January 1990, the proposed by-law amendments were read and separately voted upon at each of the local unions. The amendment to Section 37 was approved by a vote of 284 to 74, with the members of Local 1056 abstaining. Local 1056 appealed to various levels of the United Brotherhood, claiming that the vote on the amendments was invalid, but the appeal was rejected sometime after May 1990.

At about the same time as the by-law amendments were first being considered, Kopp, on behalf of the Council, began negotiating for the collective-bargaining agreement that is now in effect. Local 1056 notified Kopp that it wished to have a representative present at the negotiations and that it wished to obtain a separate agreement covering only millwrights. (Jan. 13, 1992 Kopp Dep., Ex. 26.) Kopp refused to permit a Local 1056 representative to attend the negotiations, insisting that he had sole responsibility for conducting them. (*Id.*, Ex. 27.) Although that indeed had been the practice with respect to general negotiations between the Council and the AGC, the same was not true of negotiations concerning individual plants. In the past, the Council had represented certain local unions, known as industrial locals, in which membership was based not on area of residence but place of employment. The industrial locals were reorganized into a separate bargaining unit in the late 1980s, but before then the Council's practice had been to include representatives of the industrial locals in negotiations concerning their respective plants. (Jan. 13, 1992 Kopp Dep. at 23–26.)

In 1988 and 1989, Kopp presented the AGC with a formal demand that a separate agreement be negotiated covering only millwrights. Several AGC members informed Kopp, however, that the demand was unacceptable, and so he dropped it in January 1990, apparently without informing Local 1056. On May 9, 1990, the Council and the AGC reached an agreement, subject to ratification by the Council's membership, covering all job classifications. Millwrights were assigned the highest pay scale. The agreement prohibited strikes.

On May 14, 1990, the agreement was submitted to the local unions' membership for ratification. Under the Council's ratification procedure, members would place their ballots into a ballot box, and votes would be counted after all local unions had voted. The members of Local 1056 objected to this procedure; they wished to tabulate their own ballots before putting them in the Council's ballot box. Kopp refused to permit this deviation from the standard procedure, and no such deviation was requested or permitted at any of the other local unions. Only a few of the Local 1056 members present at the meeting voted on ratification of the tentative agreement, which ultimately was approved by a vote of 500 to 200. Members of Local 1056 were involved in tallying the local unions' combined votes.

Soon after the May 14 vote, Local 1056 called a special meeting at which its members decided to strike in protest of the fact that a separate agreement had not been negotiated on behalf of the millwrights. When Kopp learned of the planned strike, he informed Local 1056 members that the agreement with the AGC had been ratified and that "[a]ny strike, walk out, slow-down or any other kind of strike or work stoppage on any project within the jurisdictional area of this District Council will be in violation of" the new agreement. (Jan. 13, 1992 Kopp Dep., Ex. 36.) The letter warned that striking workers would be subject to discharge from employment, as well as union disciplin-

ary action. (*Id.*) At about the same time, the United Brotherhood informed Local 1056 that its strike would violate international agreements covering the targeted sites, as well as the agreement between the AGC and the Council. (Mar. 6, 1991 Kopp Aff., Ex. Q.)

On June 1, Local 1056 went on strike against the Oscar J. Boldt Construction Company ("Boldt"), C.R. Meyer & Sons Co. ("Meyer"), and the P.G. Miron Construction Co., Inc. ("Miron"). Although these contractors were AGC members, they originally gave notice that they would negotiate their own agreements separate from the AGC agreement. On May 9, 1990, however, all three contractors agreed to be bound by the AGC agreement. But the local unions were not informed of this development. On the contrary, according to Local 1056, Kopp's comments at the time suggested that the independents were still independent.

Twelve Local 1056 members were discharged as a result of strike activity, and each of them filed a grievance. Kopp refused to take the grievances to arbitration because he found, after interviewing each of the workers, that all but one had been involved in the strike, a clear violation of the collective-bargaining agreement and therefore a valid ground for discharge. (Jan. 13, 1992 Kopp Dep., Ex. 3 at 31.) The one grieving worker who had not been involved in the strike was offered reinstatement.

Kopp brought internal union charges against certain of the strikers. The Council's executive committee issued reprimands to those charged but took no further disciplinary action against them. The reprimands entailed no loss of membership rights but may have been taken into account in any future disciplinary action. In an August 8, 1990 letter, Kopp told the affected members of the executive committee's decision and informed them that if they wished to challenge the decision the Council would appoint a trial committee to determine whether the charges were valid and, if so, to assess an "appropriate penalty." (Feb. 4, 1992 Kopp Dep., Ex. 41.) No one asked for a hearing. (Def. Mar. 4, 1992 Statement of Facts at ¶ 9.)

## ANALYSIS

By the court's count, plaintiffs raise six separate claims, four dealing with the treatment of Local 1056 in general and two dealing with the treatment of individual Local 1056 members. The first claim in the former category is that defendants violated 29 U.S.C. § 411(a)(1), guaranteeing all members of a union the same right to vote on union matters, by not distributing to Local 1056 members copies of the proposed amendment to By-law Section 37. Plaintiffs' second claim is that defendants violated the same equal vote provision by refusing to permit Local 1056 to tabulate its own ballots in the vote on ratification of the collective bargaining agreement. The third claim is that defendants breached their duty of fair representation by not permitting a Local 1056 representative to attend negotiations between the Council and the AGC and by not negotiating a separate collective bargaining agreement for millwrights. And the fourth general claim is that defendants improperly treated certain independent contractors as parties to the collective bargaining agreement between the Council and the AGC.

Two additional claims concern individual Local 1056 members. The first is that defendants breached their duty of fair representation by failing to arbitrate the grievances of Local 1056 members who were fired for striking. The second is that defendants disciplined certain Local 1056 members without affording them a hearing, in violation of 29 U.S.C. § 411(a)(5).

The court will consider each of these claims in turn, applying the following standards. The court must grant a motion for summary judgment if the pleadings, depositions, answers to interrogatories, admissions, and affidavits "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The party moving for summary judgment has the initial burden of asserting the absence of any dispute of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). To withstand summary judgment, however, the nonmoving party "must set forth specific facts showing

that there is a genuine issue for trial." Fed. R.Civ.P. 56(e). The court must draw all reasonable inferences from the record in favor of the nonmoving party. *Johnson v. Pelker*, 891 F.2d 136, 138 (7th Cir.1989).

### I. Distribution of By–Law Amendments

■ The LRMDA guarantees that "[e]very member of a labor organization shall have equal rights and privileges within such organization ... to vote in elections or referendums of the labor organization ... subject to reasonable rules and regulations in such organization's constitution and bylaws." 29 U.S.C. § 411(a)(1). This provision, designed to assure active participation by rank-and-file union members, applies not only to facially discriminatory rules, but also to facially neutral rules that have a discriminatory effect with respect to voting. *McGinnis v. Local Union 710, Int'l Bhd. of Teamsters,* 774 F.2d 196, 200 (7th Cir.1985). In either case, the question is whether the challenged rule or practice is reasonable in view of its "antidemocratic effects." *Id.*

■ In this case, Kopp's refusal to provide Local 1056 members with copies of the proposed amendment to By-law Section 37 was facially neutral; no local union's general membership received copies of the proposed amendment, at least not from Kopp. Nevertheless, the rule arguably had a discriminatory effect if it ensured that union rank-and-file would be kept in total ignorance of the amendment while union leaders were kept fully informed. The Ninth Circuit has rejected a similar analysis. In *Ackley v. W. Conference of Teamsters,* 958 F.2d 1463, 1473 (9th Cir.1992), the court held that the LMRDA does not prohibit the withholding of information relevant to a vote when the information is withheld from all rank-and-file. The reason: "To attempt to ensure equal information for negotiators and members alike would be wholly unrealistic." *Id.* at 1474. *Ackley* says, in effect, that since rank-and-file members cannot be told everything, they need not be told anything.

■ The Sixth Circuit avoided that drastic result, while at the same time recognizing the inevitable disparity in information control between leaders and rank-and-file, by requiring

the union to provide "its members sufficient time and information to allow an opportunity for debate and opposition" on matters subject to membership vote. *Brown v. Int'l Bhd. of Elec. Workers, Local Union No. 58 AFL–CIO,* 936 F.2d 251, 254 (6th Cir.1991). This approach seems to be consistent with the democratic spirit of the LRMDA and with *McGinnis,* where the Seventh Circuit determined that union voting rules would be reviewed under a "reasonableness" standard. To put it in terms of that standard, a union rule or practice that restricts the flow of information relevant to a membership vote must be "reasonable," in light of both its purpose and its anti-democratic effect. Thus, this court chooses not to follow *Ackley,* which seems to reject any such balancing approach.

In this case, the Council's restriction of information was relatively minor. Kopp did not keep the amendment hidden. On the contrary, in October 1989, about three months prior to the membership vote, Kopp provided Executive Committee representatives, including Local 1056 representative Rick Barber, with a copy of the amendment. And in November 1989, the text of the amendment was read to various Local 1056 delegates, who approved it. Local 1056 leaders, therefore, had the opportunity to distribute copies of the amendment and to hold discussions on it well in advance of the vote; there is no suggestion that those leaders were somehow prevented from doing so. Under these circumstances, the court concludes that, as a matter of law, the Council's refusal to distribute copies of the amendments among the general membership was not unreasonable.

Thus, summary judgment will be granted for defendants on the claim concerning distribution of by-law amendments.

### II. Tabulation of the Ratification Vote

■ Plaintiffs claim that Kopp and the Council violated the LMRDA by refusing to permit Local 1056 members to tabulate separately their votes on the collective-bargaining agreement. With respect to this claim, the court need not reach the question of whether the Council's voting procedures were reason-

able. As noted above, the LMRDA's equal vote provision is concerned with discrimination; only discriminatory rules are tested for reasonableness. The court finds nothing discriminatory about the Council's balloting procedure. Although Local 1056 was not permitted to tabulate its own votes, neither was any other local union extended that courtesy. Further, if the Council's facially uniform procedure somehow had a discriminatory effect against Local 1056 (whose members were. involved in tallying the Council-wide vote), the court is not aware of it.

Thus, defendants are entitled to summary judgment on the claim concerning tabulation of votes.

### III. Conduct of Collective–Bargaining Negotiations

Plaintiffs claim defendants breached their duty of fair representation by failing to permit a Local 1056 representative to attend collective-bargaining negotiations and by dropping the demand for a separate agreement covering only millwrights.

■ A union unfairly represents its members if it conducts negotiations in a manner that is irrational, discriminatory, or in bad faith. *Air Line Pilots Ass'n v. O'Neill,* 499 U.S. 65, ——, 111 S.Ct. 1127, 1130, 113 L.Ed.2d 51 (1991). The undisputed facts in this case show that the Council's conduct did not sink that low. Its unwillingness to give Local 1056 a seat at the bargaining table was consistent with its traditional practice and with the eminently practical proverb about cooks and soup. Although the by-laws in effect at the time provided that Kopp, as business manager, would "assist" the local unions in negotiations, Kopp's somewhat loose interpretation of that language was reasonable in light of the Council's past practice. True, that practice varied to accommodate industrial unions when negotiations involved particular plants, but the area-wide negotiations at issue in this case were of interest to all local unions, so Local 1056 had no claim to specialized treatment.

■ Nor are there facts supporting the contention that Kopp acted irrationally or in bad faith by failing to persevere with the demand for a separate millwright agreement.

It is undisputed that some, if not all, contractors rejected the demand and threatened to walk out of the negotiations because of it. Perhaps, as plaintiffs claim, Kopp exaggerated the seriousness of that threat as an excuse for dropping the demand, but that does not mean dropping it was irrational. Plaintiffs are incorrect in their assertion that Kopp could not have rationally dropped the demand without extracting a concession in return; he may have simply decided that pursuing the demand was not worth the effort. *See Air Line Pilots,* 499 U.S. at —— ——, 111 S.Ct. at 1136–37. Indeed, although plaintiffs say Kopp should have tried a little harder, they make no attempt to 'show that he might have succeeded had he done so. Nor have plaintiffs explained why a separate agreement was important to them, so it is impossible to conclude that they lost anything of substance as a result of Kopp's lack of zeal.

Because the court concludes there is no genuine issue of fact as to whether defendants fairly represented plaintiffs in the collective-bargaining negotiations, summary judgment on that claim will be entered for defendants.

### IV. Treatment of Independent Contractors

■ The court is asked to hold that the Council's membership never ratified a collective-bargaining agreement between the Council and the independent contractors Meyer, Boldt, and Miron ("the independents"), and that therefore any such agreement is without effect. The agreement was not ratified, says Local 1056, because Kopp's statements led the Council's membership to believe that the only subject of ratification was the general agreement between AGC and the Council, not any separate agreements with the independents.

Regardless of what the membership actually knew, however, it is clear that Kopp knew, prior to the ratification vote, that the independents had consented to the same general agreement that was submitted for ratification. Because Kopp was acting as an agent for the Council when he gained that knowledge, the knowledge is imputed to the Council and to its membership for purposes

**1442**

of determining whether their contractual obligations run to the independents, as well as to the AGC. *Martinson v. Brooks Equip. Leasing, Inc.*, 36 Wis.2d 209, 218, 152 N.W.2d 849 (1967). Because the membership had constructive knowledge of the independents' consent to the general agreement, ratification of that agreement was effective as to the independents.[2]

On this claim, therefore, summary judgment will be granted for defendants.

### V. Failure to Arbitrate Grievances

Plaintiffs say that if Kopp had more thoroughly investigated the discharge of striking Local 1056 members he would have found that the employers were selective in deciding who to fire, thus providing a "basis for arbitration." (Pl.Br. at 24.) Plaintiffs do not claim, however, that the employees would have prevailed in arbitration. Indeed, the cases against them were cut and dried—each of them participated in the strike, and that alone warrants discharge under Section 15.1 of the collective-bargaining agreement. Since the strikers had no valid contract claim against the employers, Kopp's failure to arbitrate their grievances does not give rise to a claim for unfair representation, even if Kopp acted partly out of hostility toward the strikers (and there is no evidence that he did). *Ooley v. Schwitzer Div., Household Mfg. Inc.*, 961 F.2d 1293, 1303–4 (7th Cir.), *cert. denied,* — U.S. —, 113 S.Ct. 208, 121 L.Ed.2d 148 (1992).

Thus, defendants are entitled to summary judgment on the claim concerning Kopp's failure to investigate and arbitrate the strikers grievances.

### VI. Issuance of Reprimands

The LMRDA provides that no union member may be "fined, suspended, expelled, or otherwise disciplined except for nonpayment of dues ... unless such member has been (A) served with written specific charges; (B) given a reasonable time to prepare his defense; (C) afforded a full and fair hearing." 29 U.S.C. § 411(a)(5). Plaintiffs claim defendants violated this provision by reprimanding the strikers without first giving them a hearing. While acknowledging that the reprimands entailed no immediate loss of membership rights, plaintiffs insist that the reprimands constituted discipline because, according to the rules of the International Brotherhood, their presence on the strikers' records will cause a higher penalty to be assessed in any future disciplinary action.

Indeed, it is difficult to imagine why the Council issued the reprimands if not to "discipline" their recipients for violating the terms of the collective-bargaining agreement. A reprimand is not merely a neutral report; it formally expresses disapproval of a person's behavior and amounts to an instruction that the behavior not be repeated. That's discipline. This court therefore disagrees with the decision in *Bougie v. Lake County, Indiana Dist. Council,* 67 L.R.R.M. 2402, 2403 (N.D.Ind.1968), where a reprimand was held not sufficiently severe to trigger the procedural protections of the LMRDA. Perhaps Congress did have more serious forms of punishment in mind when it passed the statute, but if it wished to limit the statute's application it could have done so by modifying the word "discipline." The court finds no compelling reason in this case to look behind the statute's plain language.

Defendants contend that even if the reprimand was discipline, the strikers were given adequate procedural protection when they were informed of the reprimands and given an opportunity to contest the charges at a formal hearing. Having not taking the opportunity, defendants say, the strikers waived their right to a hearing. But the statute says a union member may not be disciplined unless he or she "has been ... afforded" a hearing. The use of the past tense indicates that the hearing must precede the discipline. In this case, the process was reversed. The strikers were put in the difficult position of having to challenge disciplinary action that had already been taken. Their refusal to accept such a flawed procedure cannot be construed as a waiver of rights, for they were entitled to more than what was offered.

---

**2.** The independents have not been made parties to this action. With respect to this claim, perhaps they should have been. *See* Fed.R.Civ.P. 19(a).

The court therefore concludes that the strikers were reprimanded in violation of the LMRDA. Plaintiffs' motion for summary judgment will be granted as to this claim, and defendants will be instructed to retract the reprimands.

IT IS THEREFORE ORDERED that plaintiffs' March 20, 1992 motion for partial summary judgment is GRANTED with respect to their claim under the disciplinary provisions of the LMRDA, and DENIED in all other respects.

IT IS FURTHER ORDERED that the Council shall retract any reprimands that were issued without prior hearing on or about August 8, 1990, to Local 1056 members for their participation in strike activity.

IT IS FURTHER ORDERED that defendants' March 4, 1992 motion for summary judgment is DENIED with respect to plaintiffs' claim under the disciplinary provisions of the LMRDA and GRANTED in all other respects.

IT IS FURTHER ORDERED that this action is DISMISSED.